## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CHRISTINA MARIE FANTETTI,
PLAINTIFF,

CASE NO. 1:08CV621
(DLOTT, J.)
(HOGAN, M.J.)

VS.

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
DEFENDANT

## REPORT AND RECOMMENDATION

Plaintiff, a college student, filed her application for Supplemental Security Income in May, 2006. Her application was denied, both initially and upon reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law Judge (ALJ) in December, 2007 at Cincinnati, Ohio. Plaintiff, who was represented by counsel at the hearing, testified as did her mother, Cheri Fantetti, and Dr. Janet Bending, a Vocational Expert (VE). The ALJ rendered an unfavorable decision in February, 2008 and then Plaintiff processed an appeal to the Appeals Council, which denied review in July, 2008. Plaintiff filed her Complaint seeking judicial review in September, 2008.

## STATEMENTS OF ERROR

Plaintiff asserts a single Statement of Error, that "the ALJ erred in determining that Plaintiff was capable of full-time work based on her ability to work part-time and attend school."

## PLAINTIFF'S TESTIMONY AT THE HEARING

Ms. Fantetti testified that she was 20 years of age, weighs 135 lbs., is 5'6" tall, and is right-

handed and single. She is a high school graduate and attending college in Cincinnati on a full-time basis at Cincinnati Christian University, where she is a freshman, majoring in music. She works a total of 4-5 hours per week at Panera. Bread. Prior employment was at Fuddruckers, where she worked 5 hours per week while in school and 12 hours per week during the summer months. Both jobs consisted of bussing tables, cooking and operating the cashier. Plaintiff lives with her parents and has never worked on a full-time basis.

Plaintiff testified that she was diagnosed with aplastic anemia and nocturnal hyboglyburnia in 2004 and that the treatment consists of Soliris injections every two weeks at Children's Hospital. She also suffers from depression for which she takes Lexapro and Bu-Spar. She attributes the latter two drugs as affecting her attention span in a negative way. The Soliris injections result in fatigue and migraine headaches, which last for several days. She has been on anti-depressants since age 11 and has crying spells on a weekly basis.

Prior to her enrollment at Cincinnati Christian University, Plaintiff was a student at Raymond Walters on a full-time basis, which means she carried a course load of 12 credit hours. Plaintiff said that she could lift "at least 10 lbs." and stand for "about 1 hour." She said that after bussing tables for 30 minutes of continuous activity, she gets dizzy and her "body starts to ache."

Ms. Fantetti testified that she enjoys singing, playing the piano and writing music. She said she has trouble with her attention span and memory, but is able to eat and sleep well. She is able to drive, watch television, cook, do laundry, take out the garbage and weed the garden.

She is not able to attend school the day after her injections and cannot work more than 3 days in a row. She explained that she starts feeling fatigue after approximately 1 hour of work and must rest after 3-4 hours. If, and when, the current treatment becomes ineffective, she must endure a bone marrow transplant. (Tr. 3-21).

## MRS. FANTETTI'S TESTIMONY

Cheri Fantetti is Christina Fantetti's mother. Mrs. Fantetti explained that her daughter has a difficult time attending school on a full-time basis and would not if Christina's medical coverage did not require full-time attendance. Mrs. Fantetti testified that Christina gets her

2

injections every other Thursday at a cost of $82,000 per treatment, that her insurance through her job as a registering person at Jewish Hospital has a cap, beyond which there would be no coverage. Mrs. Fantetti confirmed Christina's testimony that severe headaches often follow her daughter's injections and that these can last for 2-3 days. She also confirmed that a bone marrow transplant would be the next treatment option. In answer to counsel's question about Plaintiff's depression, Mrs. Fantetti responded: "Well, we struggle. We all struggle. But Christina has a lot of family and friends that support her, and I think, without that, she would be in a lot worse shape." (Tr. 21-26).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked the VE one hypothetical questions, the first of which contained his residual functional capacity assessment as follows: "Assume a right hand dominant individual with a high school education and no past relevant work. The individual can: (1) lift, carry, push and pull up to 10 lbs. occasionally and 5 lbs. frequently, (2) stand and/or walk up to 2 hours in an 8-hour workday, but no more than 30 minutes at a time and then she needs to sit for 5 minutes, (3) can sit for 8 hours and for 2 hours at a time and then needs to get up for 5 minutes, (4) can occasionally stoop, kneel, crouch and climb ramps and stairs, (5) cannot crawl or climb ladders, ropes or scaffolds or work at unprotected heights or around hazardous machinery, (6) can understand, remember and carry out detailed, but not complex instructions with no complex work-related decisions, and (7) no more than ordinary and routine changes in the work setting or duties.

The VE responded that Plaintiff could perform a full range of sedentary duties, such as unskilled bookkeeping and accounting clerk, parimutuel ticket checker, receptionist and information clerk, all of which existed in representative numbers in the national economy.

The VE then testified that if Plaintiff would need to miss 3 work days per month or could only work for 4 hours at a time, competitive employment would be eliminated.

## THE ADMINISTRATIVE JUDGE'S DECISION

3

The ALJ found that Plaintiff has aplastic anemia and paroxysmal nocturnal hemoglobinuria (PNH) and that those impairments are severe. The ALJ found that Plaintiff has depression, but that it was not severe. The ALJ found that neither severe impairment, either alone or in combination, met any Listing, that Plaintiff has the residual functional capacity as stated in the ALJ's sole hypothetical question to the VE and that Plaintiff was not disabled.

## THE MEDICAL RECORD

Plaintiff was seen in the Emergency Room of Mercy Franciscan Hospital in May, 2005 for abdominal pain and nausea. Frank Fiorito, M.D. administered Colace and referred her to her primary care physician. The concern was her previously diagnosed problem with PNH, paroxysmal nocturnal hemoglobinuria.(Tr. 174-179). Stephen Eby, M.D., Plaintiff's primary care physician, reported in September, 2004 that a bone marrow sample showed "megakaryocytes and decreased elements pretty much across the board." A B12 folate was suggested to stimulate her marrow and Lexapro, a medication for depression, was stopped in order to avoid serotonin syndrome. Dr. Eby noted that Plaintiff had a history of depression and has a significant setback about once every couple months. She is susceptible to bruising.

Records from Western Family Physicians, Inc., the group, which contains Dr. Eby and others, show that Plaintiff was treated for headaches and depression, that she was prescribed Prozac prior to Lexapro, that a bone marrow transplant was contemplated in the future. She was cleared to participate in athletics (basketball) in June, 2003, while in high school at North College Hill despite self-reporting severe headaches and feeling stressed out. The records indicate that Plaintiff was hospitalized for 7 weeks at Children's Hospital when she was 12 years of age and was in a catatonic state when admitted. (Tr. 181-202).

Lesley Breech, M.D., and Assistant Professor of OB/GYN and Pediatrics at Children's Hospital, reported in March, 2005 that he had prescribed oral contraceptive pills in order to control menstrual bleeding. Dr. Breech said that Plaintiff has had aplastic anemia since the fall of 2004. (Tr. 204).

X-rays of the chest and abdomen were negative in May, 2005 and a CT of the brain was

4

also normal in January, 2005. (Tr. 204-214).

A Physical Residual Functional Capacity Assessment was done in August, 2006 by Myung Cho, M.D. Dr. Cho opined that Plaintiff could lift 20 lbs. occasionally and 10 lbs. frequently. Dr. Cho said that Plaintiff could stand/walk for 6 hours in a workday and sit for 6 hours. Dr. Cho reported that Plaintiff said she was weak at times, but was treated with iron and folic acid. She has PNH and aplastic anemia and her bone marrow biopsy revealed "eryhroid hyperplasia." (Tr. 215-222).

Bone marrow aspirate and biopsy, done at Children's Hospital in September, 2006 showed "bone marrow cellurarity of 50-70%, mildly hypocellular without MDS or leukemia." Richard Harris, M.D. was the surgeon. (Tr. 223-228).

In September, 2006, Dr. Harris reported that he sees Plaintiff on a monthly basis and that she has annual bone marrow biopsies. Dr. Harris said that Plaintiff complained of fatigue, but has had no paleness or infections and no fever, congestion or gastrointestinal problems. He described her status as "fairly stable without any specific therapy." (Tr. 229). In July, 2006, Dr. Harris reported that Plaintiff's sole therapy was "iron and folic acid" and that she had an elevated reticulocyte and LDH count, but was maintaining a platelet count of around 100,000." (Tr. 230).

Children's Hospital records between January, 2005 and April, 2006, demonstrate that Plaintiff's blood counts were low, but stable, that she reported fatigue and bruising, that her menstrual periods were regulated, that she was treated for anxiety and depression, and was adjusting at school and work rather well. (Tr. 233-269).

In October, 2007, Dr. Harris reported that Plaintiff's bone marrow aspirate and biopsy indicated Pancytopenia and that aplastic anemia should be ruled out. (Tr. 270).

In November, 2005, radiologist, Mark Halsted, M.D. reported that there was no ultrasound evidence of deep venous thrombosis after Plaintiff complained of cramping and pain in her right leg. (Tr. 272).

The Surgical Pathology Report, generated from an aspirate collected in September, 2006, confirmed the diagnosis of PNH. Plaintiff was 18 years of age at the time. (Tr. 274-329).

Dr. Harris indicated that Plaintiff had been his patient for a two-year period beginning in September, 2004, and that her impairments included PNH, aplastic anemia, depression, anxiety

5

and headaches. Her symptoms are fatigue, anemia, headaches, ringing in the ears, palpitations and dark-colored urine. The objective demonstrates "the presence of defective marrow and blood cells and the lack of certain proteins on the surface of the red cells makes the cells susceptible to being destroyed." Dr. Harris also commented that "PNH platelets can also increase susceptibility for blood clots." Continuous testing has shown "an increase in the percentage of PNH cells. Her red cell population is now 91% abnormal" and "there is an increase in red cell destruction." Dr. Harris opined that in the future, blood transfusions and/or a blood marrow transplant may be necessary and in that event, Plaintiff's sister would be the donor. Folic acid and iron are used to thwart anemia and try to boost red cell production. Dr. Harris indicated that both Plaintiff and her family are "very compliant" with prescribed medications. He reported that Plaintiff tires easily and should do no heavy lifting or strenuous physical activity. (Tr. 331-332).

A psychiatric consultative examination was done by Kevin Eggerman, M.D., in October, 2006. Dr. Eggerman reported that at the time of his examination, Plaintiff was working at Fuddruckers 15 hours per week and was a full-time student at Raymond Walters. Dr. Eggermann did diagnose Plaintiff with a depressive disorder, but found only mild or minimal limitations of Plaintiff's ability to understand, remember and carry out detained instructions, make judgments, interact appropriately, respond to pressure and respond appropriately to changes. He assigned a GAF of 65-70. (Tr. 333-340).

A psychiatric review was conducted by Nancy McCarthy, Ph.D., in November, 2006. Dr. McCarthy's diagnosis was Depressive Disorder, but she found that Plaintiff had no limitation of her ability to perform the activities of daily living and only mild difficulty in maintaining social functioning and maintaining concentration, persistence or pace. Walter Holbrook, M.D. concurred. (Tr. 355-369).

Sue Heist, R.N. is the coordinator of the BMF (bone marrow failure) unit at Children's Hospital. Ms. Heist reported in October, 2007, that Plaintiff is well-known to her as a PNH patient since 1994, and her symptoms include extreme fatigue and headaches. Current treatment is intravenous medication every two weeks, but the only cure is a bone marrow transplant. Going to school and working 4 hours per week is "very taxing" on her. (Tr. 371).

Dr. Harris reported in August, 2007, that Plaintiff had been receiving Soliris (aka Solaris)

6

injections for a few months and has had "complete normalization of her hemoglobin with reduction in her LDH levels to normal and no further fatigue." Soliris was recommended to reduce the chance of serious clots, for which Plaintiff was at risk and to prevent any further hemolysis. She had received vaccines to combat against infections, but told to watch for any fever or headaches. (Tr. 378). In June, 2007, Dr. Harris also reported that Plaintiff has had "a remarkable response to Soliris." (Tr. 382). In May, 2007, Dr. Harris reported that Plaintiff experienced "mild headaches" after the first dose of Soliris, but has not had a recurrence since. Her hemoglobin and LDH were at normal levels, although her reticulocyte count remained "somewhat elevated." (Tr, Pg. 386).

In May, 2007, Plaintiff told Children's Hospital Social Worker, Carrie Schmid, that her chronic fatigue had improved after the administration of a new medicine. (Tr. 388). Also in May, 2007, Dr. Harris reported that the dose of Soliris was 900 mg and that Plaintiff had just completed her fifth treatment. (Tr. 389). In May, 2007, Dr. Harris said that Plaintiff had experienced headaches after the first two doses of Soliris, but had no problem since. He contemplated ceasing folic acid and iron "since she will no longer be significantly hemolyzing." (Tr. 393). After her third dose of Soliris, Plaintiff's hemoglobin was in the normal range and her LDH was near normal. (Tr. 395). In April, 2007, and after her second dose of Soliris, Plaintiff complained of chest pain and palpitations. (Tr. 308). Plaintiff's first dose was administered earlier in April, 2007. (Tr. 406).

## OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are

7

supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the

8

Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321 (6th Cir. 1978); *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *see Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano*, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and

severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.*, 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect

10

of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff does not challenge the ALJ's assessment that Plaintiff's depression should not be classified as "severe." There is ample evidence in the record to show that Plaintiff has coped with her depression, through the help of medications and counseling, as well as the support of family and friends, so that her depression, whether situational or otherwise, does not significantly limit her ability to perform basic work-related activities. Plaintiff also does not contest the fact that she has the ability to understand and carry out work-related duties, can concentrate on the job at hand, has the ability to relate with co-workers, superiors and the public and would not be disruptive in the work environment. Plaintiff raises the single issue that despite trying her best to lead a "normal life" with a chronic disease, she lacks the stamina to perform 40 hours of work, week after week, in a competitive world.[1]

---

[1] Social Security Ruling 96-8p states, "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. The residual functional capacity describes "not the least an individual can do, but the most, based on all of the information in the case record." Social Security Ruling 96-9p. Several courts have observed that "the Commissioner takes the position that at step five of the sequential disability determination, only a claimant's ability to perform full-time work will permit an ALJ to render a decision of 'not disabled.'" *Barsotti v. Commissioner, Social Sec. Admin.*, 2000 W.L. 328024 (D. Or. March 13, 2000). *See Bladow v. Apfel*, 205 F.3d 356, 359 (8th Cir. 2000); *Kelly v. Apfel*, 185 F.3d 1211, 1214 (11th Cir. 1999); *Sims v. Apfel*, 172 F.3d 879 (10th Cir. 1999)(unpublished), 1999 W.L. 55334, at *3; *Matz v. Sisters of Providence in Oregon*, No. Civ. 98-1598-JO, 1999 W.L. 1201682 (D. Or. Dec. 8, 1999). In other words, "[a] claimant is disabled if she cannot perform full-time work.

In concluding that she does, in fact, have such stamina, the ALJ makes reference to the fact that she is able to vacuum, sweep, dust, take out the garbage, socialize with her friends, weed the garden as well as attend school on a full-time basis and work in a restaurant. The relevant inquiry, of course, is not *what* Plaintiff is able to do, but *how long* she is able to do it. One does not secure employment based on what one is able to do, but whether she can perform the essential functions of the job on a full-time basis over time. In addition, we know that Plaintiff's Soliris injections are given at Children's Hospital on a bi-monthly basis on Thursdays and that she lives in the Western Hills area of Cincinnati and attends college in Price Hill. We don't recall any mention in the record of the location of the Panera store where she works, but assuming that it is the one on Glenway Ave., which would be the one nearest to her home, there is at least a one-hour round trip involved in getting to and from Children's Hospital, no matter where Plaintiff is traveling from and regardless of the mode of transportation. In addition, there is the length of time it takes for the injections themselves, three to four hours, according to the un-rebutted testimony of Ms. Fantetti. (*See* Tr. 37). In addition to minimum period of 4 hours twice per month that Plaintiff necessarily would have to miss work because of required medical treatment, there is the period of incapacity, which follows the injections. This, however, is disputed.

Plaintiff testified that she misses school the day after the injections because "I'm not feeling well." (Tr. 33). She also testified that she is "very tired" after the injections and gets "really bad migraines that last for at least 2 or 3 days." (Tr. 25). She did not testify regarding her work schedule, other than to say that she was working 4 or 5 hours per week. We don't know how her school schedule fits with her work schedule. In other words, if a 12- hour school load constitutes four 3-hour classes, we don't know which days carry the heaviest load and we don't know whether the work time is accomplished on the days of the lightest school load. We also don't know Plaintiff's reason for working. Is it that she likes to, which hardly supports her fatigue argument, or is it that she must for economic reasons.

Mrs. Fantetti did, however, corroborate her daughter's testimony regarding her post-

SSR 96-8p." *Criner v. Barnhart*, 208 F. Supp.2d 937, 957 n.21 (N.D. Ill. 2002); *Gotz v. Barnhart*, 207 F. Supp.2d 886, 897 (E.D. Wis. 2002).

injection status. She testified: "There are times when she will get such a severe headache that she just has to - They've given her Percocets for the headaches because that's a side effect of the drug. And then, she basically has to go to bed. And the headaches can last anywhere from two to three days." (Tr. 38). It is also quite clear that Plaintiff is a full-time student only because her mother's medical coverage requires her to be; otherwise, she would choose a lighter schedule.

She is accommodated both at school, by permitting absences on the day after the injections, and at work by not requiring her to work more than 3 days in a row. One cannot assume that all employers would be as accommodating as Cincinnati Christian University and Panera Bread. It is also clear that Plaintiff struggles to maintain her schedule as both her mother and Nurse Heist have reported.

On the other hand, Dr. Harris, who sees Plaintiff on a monthly basis, orders her annual bone marrow biopsies, and adjusts her medications, paints a somewhat brighter picture for his patient. During the period preceding Plaintiff's first Soliris injection, in April, 2007, Plaintiff was treated with folic acid and iron supplements, but frequently complained of fatigue, headaches, bruising and excessive menstrual bleeding. There was an increase in PNH cells and blood transfusions and/or a bone marrow transplant was in the planning stage as a donor was located. After the first Soliris injection at 600 mg., Plaintiff complained of headaches, chest pain and tachycardia lasting a few minutes, but reported having more energy. After the second Soliris injection, she reported headaches, but no chest pain or tachycardia and her hemoglobin was normal and her LDH near normal. After her third Soliris injection, Dr. Harris said that her hemoglobin was normal and her LDH was slightly over normal and there were no complaints of fatigue or headaches. The fourth Soliris injection was at the 900 mg. level and following it, Plaintiff reported no problem with headaches. After the fifth dose, Dr. Harris said that, although Plaintiff's reticulocyte count remained somewhat elevated, her hemoglobin and LDH levels were normal.

Because of Dr. Harris' comments after each of the Soliris injections on the subject of the regression of Plaintiff's symptoms, we see why Plaintiff's credibility was made an issue. She suffers from a chronic disease and Soliris injections are the current treatment modality. It is true

13

that Plaintiff has required no blood transfusions and a bone marrow transplant will not be considered as long as the Soliris treatments prove effective. It would appear from the record that Plaintiff's fatigue is decreasing and that the Solaris injections have been effective. But we do not believe that substantial evidence supports the conclusion that Plaintiff is not disabled. Nor do we believe that substantial evidence supports a conclusion that she is disabled. The record is simply not clear on the subject of what she is able to do between awakening and retiring, when and for how long she must rest and how her typical day is structured. For this reason, we find that a remand under Sentence Four is appropriate as "all of the essential factual issues have not yet been resolved." *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994); *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Moreover, it would be helpful if, upon remand, testimony and medical evidence would be elicited to clarify these issues. This case is about stamina and endurance, not how much Plaintiff can lift or whether she can weed the garden.

## IT IS THEREFORE RECOMMENDED THAT

The decision of the Commissioner by **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g). Upon remand, the ALJ shall elicit testimony and evidence to supplement the record with regard to the effectivity of the continuing Soliris injections and/or other treatment for Plaintiff's two chronic blood impairments in relation to her ability to sustain full-time employment

August 3, 2009

Timothy S. Hogan
United States Magistrate Judge

14

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\HOGANTS\fantetti.wpd

15